MCA, INC., d/b/a MCA Music, a division thereof, Plaintiff-Appellee,

v.

Earl WILSON, Jr., Phil Oesterman, Billy Cunningham, LMPC Music Co., Libra Records, The Libra Company, Art D'Lugoff d/b/a The Village Gate, Defendants,

Earl Wilson, Jr., Arthur D'Lugoff, Defendants-Appellants.

Nos. 934, 935, Dockets 80–7776, 80–7886.

United States Court of Appeals, Second Circuit.

Argued April 29, 1981.

Decided July 30, 1981.

Roy M. Cohn, New York City (Saxe, Bacon & Bolan, P. C., Michael Rosen, Lawrence M. Abramson, New York City, of counsel), for defendant-appellant Earl Wilson, Jr.

Max R. Millman, Philadelphia, Pa. (David N. Stein, New York City, on the brief), for defendant-appellant Art D'Lugoff.

Robert C. Osterberg, Abeles Clark & Osterberg, New York City, for plaintiff-appellee MCA, Inc.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

From January 1974 until July 1976, a show called "Let My People Come" was performed at the Village Gate, a cabaret in the Greenwich Village section of New York City. Thereafter, it had short runs in several other cabarets and legitimate theaters. The producers, perhaps wisely, refrained from seeking reviews by established theater critics. However, columnists who viewed the production described it, among other things, as an "erotic nude show" with "sex content raunchy enough to satisfy the most jaded porno palate", a show whose "main concern is not fornication but fellatio and cunnilingus."

The music in the show was said by one columnist to sound "like something we've heard before but definitely not with these

words." One of the songs, described by reporters as a "take-off" on the Andrews Sisters' and Bette Midler's renditions of a copyrighted song called "Boogie Woogie Bugle Boy" is the subject of this litigation. Following a non-jury trial before Judge Cooper in the United States District Court for the Southern District of New York, MCA, Inc., the copyright owner, was awarded a total of $324,955.00 against various participants in the theatrical venture for infringement of the copyright on this song. Judge Cooper's opinion is reported in 425 F.Supp. at 443, and familiarity with it is assumed.

Boogie Woogie Bugle Boy is the alliterative description of a soldier in "Company B" who hailed from Chicago. During early rehearsals for Let My People Come, defendant Wilson played for the cast a rough version of a song he had composed which alliteratively described the "Cunnilingus Champion of Company C" who came from Memphis or maybe St. Joe. As Judge Cooper found, cast members immediately commented concerning the similarities between the two songs. 425 F.Supp. at 448. Because it was felt that the similarities would create publicity, they were not eliminated; indeed, to some extent, they appear to have been fostered. *Id.* Our review of the testimony, lay and expert, and the visual and aural impressions we have gained from the songs themselves satisfy us that the district court's factual finding of substantial similarity was not clearly erroneous. *See Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966); Fed.R.Civ.P. 52(a). Unless, therefore, defendants' incorporation of the song into their show constituted fair use under the copyright law, plaintiff has established its claim of copyright infringement.

In asserting the defense of fair use, defendants contend that they were using plaintiff's copyrighted song in a reasonable manner and that therefore they were not required to secure plaintiff's consent. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205–06 (2d Cir. 1979); *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 144 (S.D.N.Y.1968).

When weighing the merits of a defense such as this, a court does not have the benefit of either a statutory or judicial definition of what is reasonable and fair. It has instead certain suggested criteria to which it may look in making this determination.

Section 101 of the 1976 Copyright Act Revisions, 17 U.S.C. § 107, which, although not controlling herein, is intended to be a codification of preexisting law, *see Meeropol v. Nizer*, 560 F.2d 1061, 1068–69 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), provides in part that the "fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching, . . . scholarship, or research, is not an infringement of copyright." The statute then sets forth four factors to be considered in determining whether a particular use is fair.

■ The court should, for example, look at the nature of the copyrighted work. In so doing, the court may consider, among other things, whether the work was creative, imaginative, and original, *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217, 221 (D.N.J.1977), and whether it represented a substantial investment of time and labor made in anticipation of a financial return, *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978).

■ The court should also look at the purpose and character of the alleged infringing use, including its commercial or non-profit educational motivation or design. While commercial motivation and fair use can exist side by side, the court may consider whether the alleged infringing use was primarily for public benefit or for private commercial gain. *Meeropol v. Nizer, supra*, 560 F.2d at 1069; *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Marvin Worth Productions v. Superior Films Corp.*, 319 F.Supp. 1269, 1275 (S.D.N.

Y.1970). The court may also consider whether the paraphrasing and copying was done in good faith or with evasive motive. *Roy Export Company Establishment of Vaduz, Liechtenstein, Black, Inc. v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1146–47 (S.D.N.Y.1980); *Nutt v. National Institute Incorporated for the Improvement of Memory*, 31 F.2d 236, 237 (2d Cir. 1929).

■ The third factor concerns the extent of the copying. Use of copyrighted material without the owner's consent generally will not be considered reasonable if it extensively copies or paraphrases the original or bodily appropriates the research upon which the original was based. *Rosemont Enterprises, Inc. v. Random House, Inc., supra*, 366 F.2d at 310; *Walt Disney Productions v. Mature Pictures Corp.*, 389 F.Supp. 1397, 1398 (S.D.N.Y.1975); *see Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 756 (9th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *Universal City Studios, Inc. v. Sony Corp. of America*, 480 F.Supp. 429, 454 (C.D. Cal.1979).

The final suggested factor concerns the effect of the alleged infringing use upon the potential market for or value of the copyrighted work. The aim of the copyright laws is to stimulate artistic creativity for the benefit of the public, and this is done by providing the artist with the financial motivation for creativity that flows from a limited form of monopoly. *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975); *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 393–95, 88 S.Ct. 2084, 2085–2086, 20 L.Ed.2d 1176 (1968). However, where a claim of fair use is made, a balance must sometimes be struck between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied. *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1352 (Ct.Cl.1973), *aff'd per curiam by an equally divided court*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975); *Berlin v. E. C. Publica-*

*tions, Inc.*, 329 F.2d 541, 543–44 (2d Cir.), *cert. denied*, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use. *See Meeropol v. Nizer, supra*, 560 F.2d at 1070; *Elsmere Music, Inc. v. National Broadcasting Co.*, 482 F.Supp. 741, 747 (S.D.N.Y.), *aff'd*, 623 F.2d 252 (2d Cir. 1980) (per curiam); *Time, Inc. v. Bernard Geis Associates, supra*, 293 F.Supp. at 146.

■ Using the above factors as guideposts, we may now review the evidence to determine whether the district court's rejection of the fair use defense was clearly erroneous. Since the issue of fair use is one of fact, *Meeropol v. Nizer, supra*, 560 F.2d at 1068; *Eisenschiml v. Fawcett Publications, Inc.*, 246 F.2d 598, 604 (7th Cir.), *cert. denied*, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957), the clearly erroneous standard of review is appropriate.

Among the exhibits introduced below were two phonograph records. One, published by MCA Records, was an Andrews Sisters' recording which included Boogie Woogie Bugle Boy. The other, published by the defendant Libra, was a recording of Let My People Come which included Cunnilingus Champion. The parties stipulated that the sale of these records was a traditional means of exploiting musical works. Other stipulated means were the use of the songs in stage performances and the sale of printed copies. Both of the songs at issue herein were exploited in all three media. In determining, therefore, whether defendants' use of plaintiff's song was unfair, we start from the premise that the songs were competing works.

When this action was commenced in July 1974, defendants did not contend that they were making fair use of plaintiff's song. Instead, they simply denied plaintiff's allegation that Cunnilingus Champion was substantially copied from plaintiff's copyrighted work. It was more than a year later, after plaintiff had amended its complaint to claim common law copyright infringement of the Andrews Sisters' recording of Boogie

Woogie Bugle Boy, that defendants first pleaded a fair use defense. The record is not at all clear, however, as to when this claim of fair use came into being.

In their Rule 16 pretrial stipulation of undisputed facts, the parties agreed that, when defendant Wilson played Cunnilingus Champion for the first time at a cast rehearsal in early November 1973, some of the cast members told him they thought it was similar to Bugle Boy. Wilson and defendant Oesterman, the producer-director of the show, then discussed with cast members the possibility of being sued because of the similarity. Wilson and Oesterman decided to proceed with Cunnilingus Champion because they concluded it was not the same as Bugle Boy. The parties further stipulated that, when Cunnilingus Champion was written, it was not intended to make any statement about Bugle Boy or to parody Bugle Boy in the sense of taking it out of context and holding it up to ridicule.

At trial, defendant Wilson testified that, at the time he wrote Cunnilingus Champion, he did not intend it to be either a burlesque or a satire. He stated that, sometime during the rehearsals that followed the song's unveiling, he formed the intent that the song would be a burlesque of the music of the 1940's. It is quite obvious, of course, that the words "Cunnilingus Champion of Company C", as used in the title and throughout the lyrics of Wilson's song, were not a take-off on the music of the '40's but on plaintiff's song alone. It is not surprising, therefore, that Wilson testified that, when his song finally was performed on stage, he then intended it to be a spoof of Bugle Boy. Expanding on this point in his brief, Wilson states:

> The parallelism of titles alone makes it obvious that Appellant's work in some way refers to Appellee's work and, as a burlesque, that is precisely its intention.

Defendants' argument in short is that, because Cunnilingus Champion "deals with the humorous practice of cunnilingus" and

Wilson was trying to portray that practice as "joyous", he was entitled to use a competing copyright owner's music that was "immediately identifiable as something happy and joyous and it brought back a certain period in our history when we felt that way." [1] Defendants rely principally on two prior decisions of this Court to support this argument, *Berlin v. E. C. Publications, Inc., supra,* 329 F.2d 541 and *Elsmere Music, Inc. v. National Broadcasting Co., supra,* 623 F.2d 252. This reliance is misplaced.

In *Berlin,* the copyright owners of twenty-five popular songs sued the publishers of "Mad Magazine," a comic publication, for publishing parody lyrics which the magazine's readers might sing to the music of plaintiffs' songs. Defendants did not publish the music, and plaintiffs made no claim that the parodies would even partially fulfill the demand for plaintiffs' original songs to their damage. Then Chief Judge Kaufman, writing for the court, said that "where as here, it is clear that the parody has neither the intent nor the effect of fulfilling the demand for the original, and where the parodist does not appropriate a greater amount of the original work than is necessary to 'recall or conjure up' the object of his satire, a finding of infringement would be improper." 329 F.2d at 545.

In *Elsmere,* the copyrighted song was an advertising jingle entitled "I Love New York," which was used by the New York State Department of Commerce in television commercials, principally to extol the merits of New York City. One of NBC's popular productions is a satirical comedy program entitled "Saturday Night Live". On May 20, 1978, the performers on this show did a take-off on New York City's advertising campaign by plugging for the biblical city of Sodom. As part of this take-off, they sang a song "I Love Sodom" to the tune of "I Love New York". In holding this to be fair use, the district court found that defendants' song did not interfere with the marketability of plaintiff's;

---

1. Boogie Woogie Bugle Boy was copyrighted and published in 1941, and achieved its greatest popularity during the tragic and unhappy years of World War II, in which 292,131 Americans lost their lives.

that it did not affect the value of the copyrighted work nor could it have the effect of fulfilling the demand for the original. 482 F.Supp. at 747. This Court affirmed on the opinion of the district judge. 623 F.2d at 253.

In the instant case, plaintiffs and defendants were competitors in the entertainment field. Both Bugle Boy and Cunnilingus Champion were performed on the stage. Both were sold as recordings. Both were sold in printed copies. Testimony, accepted as credible by the trial court, indicated that Cunnilingus Champion was made to sound like Bugle Boy to create publicity. 425 F.Supp. at 448. Moreover, the district judge specifically rejected as incredible the testimony of the defendant Wilson that he was combining the innocent music of the '40's with words often considered to be taboo to make a very funny point. 425 F.Supp. at 453. This state of facts is a far cry from those which existed in *Berlin* and *Elsmere.*

In *Elsmere,* the district court held, and quite correctly so, that the song "I Love Sodom" was as much a parody of "I Love New York" as it was of the overall "I Love New York" advertising campaign. The court then proceeded to state in dictum that, even if it were found that defendants' song did not parody plaintiff's, this would not preclude a finding of fair use. The question, said the court, is whether the use is a valid satire or parody, not whether it is a parody of the copied song. Appellants in the instant case contrast this dictum with Judge Cooper's apparent requirement that a legally permissible parody must be of the copyrighted song itself, and argue that Judge Cooper erred. We agree with appellants' argument to the extent of holding that a permissible parody need not be directed solely to the copyrighted song but may also reflect on life in general. However, if the copyrighted song is not at least in part an object of the parody, there is no need to conjure it up. *See Walt Disney Productions v. Air Pirates, supra,* 581 F.2d at 758 n.15. Indeed, defendants concede that, without reference to plaintiff's song, there would be no parody.

The district court held that defendants' song was neither a parody or burlesque of Bugle Boy nor a humorous comment on the music of the '40's. 425 F.Supp. 453. We are not prepared to hold that a commercial composer can plagiarize a competitor's copyrighted song, substitute dirty lyrics of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society. Such a holding would be an open-ended invitation to musical plagiarism. We conclude that defendants did not make fair use of plaintiff's song. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra,* 604 F.2d at 205–06; *Walt Disney Productions v. Mature Pictures Corp., supra,* 389 F.Supp. at 1398; *Rohauer v. Killiam Shows, Inc.,* 379 F.Supp. 723, 732–33 (S.D.N.Y.1974), *rev'd on other grounds,* 551 F.2d 484 (2d Cir.), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Robert Stigwood Group Ltd. v. O'Reilly,* 346 F.Supp. 376, 384 (D.Conn.1972), *rev'd on other grounds,* 530 F.2d 1096 (2d Cir.), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976).

In reaching this conclusion, we have not overlooked the district court's finding that the amount copied from plaintiff's song was so substantial as to be unfairly excessive. Although we might have reached a different conclusion on the same facts, the district court's finding was not clearly erroneous and furnishes further support for its holding of infringement. *Rosemont Enterprises, Inc. v. Random House, Inc., supra,* 366 F.2d at 310; *Walt Disney Productions v. Mature Pictures Corp., supra,* 389 F.Supp. at 1398.

Following the entry of the district court's interlocutory judgment on liability, the matter was referred to a special master for the determination of damages. Under the law of this Circuit as it existed prior to the 1976 amendments of the Copyright Act, the owner of an infringed copyright was entitled to recover both his own damages and the infringer's profits. *Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc.,* 329 F.2d 194,

196–97 (2d Cir. 1964). Where it was difficult to produce legally acceptable proof of actual damages or profits, statutorily prescribed "in lieu" awards could be made. *Id.; Douglas v. Cunningham*, 294 U.S. 207, 208–09, 55 S.Ct. 365, 366–367, 79 L.Ed. 862 (1935).

■ Because infringement of copyright is considered a tort, the general statement often is made that all defendants concerned in the infringement are jointly and severally liable. *See, e.g., Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.*, 453 F.2d 552, 554 (2d Cir. 1972). However, this rule applies only to the defendants liability for damages. Insofar as there is liability for illegal profit, the liability is several; one defendant is not liable for the profit made by another. *Washingtonian Pub. Co. v. Pearson*, 140 F.2d 465, 467 (D.C.Cir.1944); *Sammons v. Colonial Press, Inc.*, 126 F.2d 341, 344–48 (1st Cir. 1942); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 86 F.Supp. 399, 403 (S.D.N.Y.1949), aff'd, 191 F.2d 99 (2d Cir. 1951).

In the instant case, plaintiff offered proof as to defendants' gross receipts, and the burden was then on the defendants to establish what portion of those receipts was not profit from their use of the infringing song. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 48 (2d Cir. 1939), aff'd, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940). This they failed to do. Because the special master was required to give every indulgence to plaintiffs, *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 121 (2d Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962), we cannot say that he erred in allocating one-twentieth of the total receipts from Let My People Come to Cunnilingus Champion, although, as triers of the fact, we might have been less generous. Based on this percentage allocation, the special master found the defendants severally liable to plaintiff for their profit from the infringing song's performance in the show in the following amounts:

| | |
|---|---|
| Libra | $194,294.00 [2] |
| D'Lugoff | $ 3,250.00 |
| Cunningham | $ 429.00 |

| | |
|---|---|
| Oesterman | $ 24,108.00 |
| Wilson | $ 11,924.00 |

■ We find no error in these awards, except with regard to the defendant D'Lugoff. D'Lugoff was president of Village Gate. Although he was in charge of the premises, he had nothing to do with Let My People Come. He was paid an annual salary of $25,000.00. There was no proof that this salary was contingent upon or fixed by the profits of Let My People Come. Moreover, other shows were being performed on the premises. Nevertheless, the special master awarded plaintiff one-twentieth of D'Lugoff's salary during the two and one-half years that Let My People Come was at the Village Gate.

The term "profit" was not defined in the Copyright Act and therefore must be assumed to have its ordinary or usual meaning. *Heli-Coil Corp. v. Webster*, 352 F.2d 156, 167 (3d Cir. 1965). Webster's Third New International Dictionary defines profit as "entrepreneurial or employer income as distinguished from wages or rent." Black's Law Dictionary, Revised Fourth Edition, says profit is the "[g]ain realized from business or investment over and above expenditures" and "[i]n distinction from the wages of labor." The salary paid D'Lugoff by Village Gate was not "profit" from Cunnilingus Champion. The award of $3,250.00 as against him cannot stand.

The special master awarded a total of $10,005.00 against Libra, Oesterman and Wilson for their share of profits from the record albums of the show, and this award, arising out of the unfair use of plaintiff's copyrighted song, will not be disturbed. An award of $2,381.00 for one-nineteenth of the total receipts from souvenir programs was made against Libra alone, and that defendant has not appealed.

■ Plaintiff offered no evidence of actual damages, seeking instead the "in lieu of actual damages" award authorized by 17 U.S.C. § 101(b), as it existed prior to 1976. *See* 17 U.S.C. § 101(b) (1976). The special

---

**2.** Libra was a limited partnership, with the defendant Oesterman as the sole general partner. Gnostic Music Co. and LMPC records were simply account names used by Libra. Libra, Oesterman, and Cunningham have not appealed from the judgment entered against them.

master treated each week's performance of Let My People Come as a separate infringement, and awarded plaintiff a total of $32,500.00 against all of the defendants, representing a $250.00 statutory award for each of the one hundred and thirty weeks that Let My People Come played at the Village Gate.

In *Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.*, 475 F.Supp. 78, 82 (S.D.N.Y. 1979), Judge Lumbard, sitting as a district judge, described this Circuit's test for multiple infringements as follows:

> In close cases, this circuit has also used the "time" test—which looks to the proximity in time of repeated infringements in deciding whether to treat them as multiple infringements or as one continuing infringement—and the "heterogeneity" test—which looks to differences between the advertisers, financial arrangements, locales, audiences, and other significant variables in determining whether the circumstances surrounding successive infringements are so similar that those infringements should be treated as one continuing infringement or so different that they should be treated as multiple infringements. *See Robert Stigwood Group Ltd., supra*, 530 F.2d 1096, 1103. *See also Davis v. E. I. duPont, supra*, 249 F.Supp. 329, 333–43.

We think this is a case in which the "time" test should have been applied and that Let My People Come's continuous run at the Village Gate should have been treated as one continuing infringement. *See Roy Export Co. v. CBS, supra*, 503 F.Supp. at 1157. In so holding, we are not unmindful of the substantial award based on defendants' profits and the fact that, although plaintiff was not obligated to seek preliminary injunctive relief, *Szekely v. Eagle Lion Films, Inc.*, 140 F.Supp. 843, 849 (S.D.N.Y.1956) *aff'd*, 242 F.2d 266 (2d Cir.), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957), prompt resort to such remedy probably would have made the question of continuous performance largely academic. *See Robert Stigwood Group,*

*Ltd. v. O'Reilly, supra*, 530 F.2d at 1103. We note also, although we do not find it controlling, that Congress has since decreed that a plaintiff who elects to recover statutory "in lieu" damages will be precluded from recovering any profits. *See* 17 U.S.C. § 504(c)(1) (Supp. III 1979); 3 *Nimmer on Copyright* § 14.01[B] (1980). The $32,500.00 award of statutory damages is reduced to $250.00.

■ We have no problem in affirming the award of statutory damages based upon the manufacture and sale of the cast album recordings. These recordings contain both words and music, which together constituted an unfair use of plaintiffs song. The printed program, however, contained only the lyrics, which, standing alone, hardly amounted to an infringement of Bugle Boy. Moreover, we fail to see how plaintiff could conceivably have been damaged by the sale of defendants' program. The award of $22,626.00 for the "making" of these programs is reversed.

■ Appellants' final argument meriting comment concerns the award of $20,000.00 for the fees of plaintiff's attorney. In this Circuit, the practice of awarding such fees "has been sparingly used and the amounts awarded modest." *Orgel v. Clark Boardman Co., supra*, 301 F.2d at 122. Here, plaintiff was successful in recovering on its statutory copyright claim but was unsuccessful in its claim for infringement of an alleged common law copyright. *See* 425 F.Supp. at 454–55. Moreover, plaintiff opted to pursue the lengthy process leading to the substantial damage award which it has received, rather than quickly halting defendants' infringement with a preliminary injunction. Finally, it appears from the conduct of the defendants Oesterman and Cunningham throughout the course of the litigation and the fact that they have not even bothered to appeal, that the burden of the award may be borne in substantial part by the defendant D'Lugoff, whose role in the infringement was minimal at best and whose liability was questionable. *See Roy Export Co. v. CBS, supra*, 503 F.Supp. at 1155–56; *Screen Gems-Columbia*

*Music, Inc. v. Mark-Fi Records, Inc.*, 327 F.Supp. 788, 792 (S.D.N.Y.1971) *rev'd on other grounds*, 453 F.2d 552 (2d Cir. 1972). Under all the circumstances, we feel that an award of attorneys fees in the amount of $10,000.00 would be fair and adequate.

The judgment appealed from is modified by:

1. eliminating the award of $3,250.00 against the defendant D'Lugoff for lost profits;

2. reducing the award against Wilson and D'Lugoff for damages from the performance of Cunnilingus Champion in Let My People Come by $32,250.00;

3. eliminating the award of $22,626.00 against Wilson and D'Lugoff for damages in connection with the making of the programs;

4. reducing the award of attorneys fees against Wilson and D'Lugoff from $20,000.00 to $10,000.00

In all other respects, the judgment is affirmed.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent for the reason that in my view the defendants made a fair and limited use in a reasonable manner of plaintiff's successful copyrighted work to produce what amounts to a sexual satire or burlesque of contemporary mores by putting a comic or humorous twist on the more conventional Bugle Boy and by parodying the Andrews Sisters' style, which depended heavily on "boogie-woogie" music. This entitled the defendants to the protection of the "fair use" doctrine as codified in § 101 of the 1976 Copyright Act, 17 U.S.C. § 107. As the majority concedes, a fair use parody need not be directed toward the copyrighted work, see *Elsmere Music, Inc. v. National Broadcasting Co.*, 482 F.Supp. 741, 746 (S.D.N.Y.1980), aff'd, 623 F.2d 252 (2d Cir. 1980); *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964). The defendants used only enough of "Bugle Boy" to conjure up a recollection of that image and thereby make possible a parody with a completely new, mocking, satirical turn to it. There is no evidence that the parody caused any damage to the plaintiff. Although "Boogie Woogie Bugle Boy" (plaintiff's work) and "Cunnilingus Champion of Company C" (defendants' parody) were both produced in record form, there is no evidence that the latter was capable of serving as a substitute for the former. On the contrary, it is readily apparent from the records and the lyrics that the two songs fill completely different demands and that a purchaser desiring plaintiff's work would not accept that of defendants as a substitute.

Under the doctrine of "fair use" defendants were entitled to appropriate so much of the copyrighted work as was reasonably necessary to recall it or conjure it up. *Berlin v. E. C. Publications, Inc., supra*, 329 F.2d at 545. As we stated in *Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252, 253 n.1 (2d Cir. 1980):

> "Even more extensive use would still be fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary."

This is exactly what was done in the present case. Defendants made limited use of Bugle Boy to create a new and (to many) humorous effect. The lyrics of the two songs are almost entirely different. Indeed only one short phrase ("He's in the Army now") is common to both. The rest are not the same. Moreover, much of the similarity in the music of the two tunes is attributable to the "tom-tom" passages in the Andrews Sisters and Midler recordings, as well as in the defendants' work, which were never copyrighted but were used by Judge Cooper as the basis for his findings. Thus, while I agree with the majority that there is barely sufficient similarity between the music of the two songs to preclude our labelling Judge Cooper's finding of infringement clearly erroneous, the record indicates that for fair use parodying the defendants only appropriated as much of the original work as was reasonably necessary to recall Bugle Boy.

In ruling on the issue of fair use, Judge Cooper held that to qualify as fair use the infringing item must be a burlesque of the copyrighted work itself, not just a use of the copyrighted material to parody something else, stating:

"defendants concede that Champion was not intended to be a parody of Bugle Boy in the sense of taking Bugle Boy out of context in an attempt to hold it up to ridicule. [PTO 3–a–51, 52] Defendants may have sought to parody life, or more particularly sexual mores and taboos, but it does not appear that they attempted to comment ludicrously upon Bugle Boy." *MCA, Inc. v. Wilson*, 425 F.Supp. at 453 (footnote omitted).

As the majority recognizes (p. 185, *supra*), this was error. In *Elsmere Music, supra*, we held that the song "I Love Sodom" was a fair parody use of "I Love New York" even though Judge Goettel found, 482 F.Supp. at 745, that the former was "an attempt . . . to satirize the way in which New York City has attempted to improve its somewhat tarnished image through the use of a slick advertising campaign [and] had nothing to do with . . . the song 'I Love New York' itself." The district court further stated:

"In addition, even if it were found that 'I Love Sodom' did not parody the plaintiff's song itself, that finding would not preclude a finding of fair use. Under the holding of *Berlin v. E. C. Publications, Inc., supra*, and the criteria set down in section 101 of the 1976 Copyright Act, 17 U.S.C. § 107, the issue to be resolved by a court is whether the use in question is a valid satire or parody, and not whether it is a parody of the copied song itself. To the extent that either *MCA* or *Walt Disney* can be read to require that there be an identity between the song copied and the subject of the parody, this Court disagrees." 482 F.Supp. at 746 (footnotes omitted).

In affirming, we agreed with the district court's rejection of Judge Cooper's *MCA* limitation, stating, "Believing that, in today's world of often unrelieved solemnity, copyright law should be hospitable to the humor of parody, and that the District Court correctly applied the doctrine of fair use, we affirm on Judge Goettel's thorough opinion." 623 F.2d at 253 (footnote omitted). This broader legal concept of parody has been advocated by copyright scholars who have taken a dim view of Judge Cooper's limitation. See, e.g., Light, *Parody, Burlesque, and the Economic Rationale for Copyright*, 11 Conn.L.Rev. 615, 631–32 (1979).

Thus in *Elsmere* we adhered to our views in *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964), where we held that certain parody lyrics printed in Mad Magazine, intended to comment humorously on the world of that time and designed to be sung to the tunes of various popular Irving Berlin songs, did not infringe Berlin's copyright.

Since defendants' work is clearly a parody or burlesque the next step is to determine whether, in creating Champion, they have taken more of Bugle Boy than is reasonably necessary to " 'recall or conjure up' the original[ ]," *Berlin, supra*, 329 F.2d at 545. This will vary according to the situation encountered in each case. Clearly a verbatim copy of both music and lyrics could hardly be defended as a parody, since the effect would be to deprive the copyright owner of the fruits of his labors. On the other hand, a substantial taking for parody purposes is permissible where, as here, the parody does not fulfill the demand for the copyrighted work. For instance, in *Elsmere* Judge Goettel observed that

"it becomes apparent that this portion of the piece, the musical phrase that the lyrics 'I Love New York' accompany, is the heart of the [plaintiff's] composition. Use of such a significant (albeit less than extensive) portion of the composition is far more than merely a *de minimis* taking. . . . The tune of 'I Love Sodom' is easily recognizable as 'having been appropriated from the copyrighted work,' . . . and is a taking of a substantial nature." 482 F.Supp. at 744 (footnote and citations omitted).

However, he correctly concluded that the copying nevertheless amounted to fair use as a parody. As we started in *Berlin*,

"At the very least, where, as here, it is clear that the parody has neither the intent nor the effect of fulfilling the demand for the original, and where the parodist does not appropriate a greater amount of the original work than is necessary to 'recall or conjure up' the object of his satire, a finding of infringement would be improper." 329 F.2d at 545.

On the *Elsmere* appeal we observed,

"we note that the concept of 'conjuring up' an original came into the copyright law not as a limitation on how much of an original may be used, but as a recognition that a parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point. *Columbia Pictures Corp. v. National Broadcasting Co.*, 137 F.Supp. 348, 354 (S.D.Cal.1955). A parody is entitled at least to 'conjure up' the original. Even more extensive use would still be fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect of commentary." 623 F.2d at 253 n.1.

Judge Cooper, having erroneously limited the scope of permissible use of a copyrighted work for parody purposes, reached this issue only by way of dictum, indicating that he would have held the defendants' use to be excessive because "Champion not only conjures up the memory of Bugle Boy, it shares some of the same lyrics and music." 425 F.Supp. at 454. This is both a misunderstanding of the "conjure up" test and a misconstruction of the facts. As both *Berlin* and *Elsmere* demonstrate, the fact that the parody shares some of the same lyrics and music as the copyrighted work does not itself mean that the taking is too substantial. Indeed it is exactly by such overlap that the original is recalled or conjured up. In *Elsmere* the repetition of the exact music from the key "I Love New York" section of that song, coupled with use of two of the four original words ("I Love"), was held not to be too substantial a taking to allow the fair use defense. As we stated in *Berlin*,

"While brief phrases of the original lyrics were occasionally injected into the parodies, this practice would seem necessary if the defendants' efforts were to 'recall or conjure up' the originals; the humorous effect achieved when a familiar line is interposed in a totally incongruous setting, traditionally a tool of parodists, scarcely amounts to a 'substantial' taking, if that standard is not to be woodenly applied." 329 F.2d at 545.

Here, the defendants took only one short phrase from the entire copyrighted lyric. The rest of the thematic conjuring was done by the overall setting and the word play on the title. That word play is the very kind of "conjuring up" that the fair use defense allows. As for the music, the discussion above shows that even in the absence of a fair use question there is some doubt as to whether the taking from the copyrighted version would be substantial enough to amount to an infringement. The overall musical style is the same, the harmony and melody are similar, and there are a few specific chord and note passages that overlap. None of this, however, is so great as to preclude the parody defense. The humorous twist would not exist if the "boogie woogie" sound of the original (incidentally, not copyrighted) were not recalled. The whole point of the fair use defense is to allow *some* use of the copyrighted material. Here it was not excessive.

The next question is whether the defendants' use of Bugle Boy resulted in their satisfying the same demand as that song did, which is an important factor because an otherwise fair use might become unfair if it deprives the copyright holder of the market served by him and thus causes him real economic damage, 3 M. Nimmer, *Copyright*, § 13.05[A][4], note 3. In *Meeropol v. Nizer*, 560 F.2d 1061, 1070 (2d Cir. 1977), we stated:

"A key issue in fair use cases is whether the defendant's work tends to diminish or prejudice the potential sale of plaintiff's work. *Marvin Worth Productions*

*v. Superior Films Corp.*, 319 F.Supp. 1269, 1274 [168 USPQ 693, 697–698] (S.D.N.Y. 1970); 2 M. Nimmer *Copyright*, § 415." This issue was not reached by Judge Cooper because of his erroneous ruling that defendants' work did not burlesque plaintiff's copyrighted work itself. 425 F.Supp. at 453 n.19. Plaintiff-appellee argues that since the two works were exploited through the same media (records, printed copies, live performances) Champion *ipso facto* had the effect of diminishing the demand for Bugle Boy. In my view this reasoning is fatally defective. The issue is not whether the parody uses the same media as the copyrighted work—most parodies do—but whether it is "capable of serving as a *substitute* for the original," A. Latman, The Copyright Law 215 (5th ed. 1979) (emphasis supplied), which depends on demand and product overlap rather than on the market in which the two products are vended. Applying this correct standard it is eminently clear that the two works respond to wholly differing demands and that a customer for one would not buy the other in its place. A raucous and explicitly sexual satire is not a substitute for the innocence of Bugle Boy. I therefore cannot agree with the majority's "premise that the songs were competing works," Maj. Op. 183, or that the sale or rendition of defendants' song would interfere with the marketability of plaintiff's song.

The majority implies that to "substitute dirty lyrics" should not permit a person to "escape liability by calling the end result a parody or satire on the mores of society." Maj. Op. 185. In my view the defendants' use of "dirty lyrics" or of language and allusions that I might personally find distasteful or even offensive is wholly irrelevant to the issue before us, which is whether the defendants' use, obscene or not, is permissible under the fair use doctrine as it has evolved over the years. We cannot, under the guise of deciding a copyright issue, act as a board of censors outlawing X-rated performances. Obscenity or pornography play no part in this case. Moreover, permissible parody, whether or not in good taste, is the price an artist pays for success, just as a public figure must tolerate more personal attack than the average private citizen. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As we pointed out in *Berlin* parody "has thrived from the time of Chaucer." 329 F.2d at 545. Even the *Canterbury Tales* indulged largely in sexual satire.

Lastly, since there is no evidence of actual or potential economic damage caused to MCA by reason of defendants' performance and sale of recordings of Champion, I believe that the award of damages here is inappropriate, excessive, and an unjustifiable windfall to the plaintiff.

For these reasons I would reverse the judgment of the district court.